Well, good morning, everyone. Good. Good day. A little better. Yeah, a little better than yesterday. Before we hear arguments, Judge Rawlinson and I would like to thank and acknowledge Judge Paul Huck from the Southern District of Florida, who's visiting with us for a few days. And we're very appreciative of his willingness to come out and help us out. Thank you, Judge. It's always my pleasure. So we'll begin. Let's see. I'm going to call the cases that appear on the calendar, but we have some that are submitted on the briefs and record. The first case, the United States v. NOPI, is submitted on the briefs and records at this time. On the next case, there are two cases there. 18-10059 is submitted on the briefs and record. And we'll hear argument in United States v. Walters, I believe it is. Good morning, Your Honors. May it please the Court, Alexi Haller representing Defendant Appellant Andre Antonio Walters in this appeal. I would please like to reserve five minutes for rebuttal. That's fine. This case involves an important issue regarding federal sentencing law, namely to what extent a defendant with a limited role is responsible for financial losses resulting from a much larger fraud scheme under the relevant conduct provision of the sentencing guidelines. Mr. Walters was convicted by a jury of four counts of mail fraud involving a grand total of $3,155. At sentencing, under the relevant conduct provision, Mr. Walters was held responsible for a loss in the amount of $5,263,000. There is no dispute that Mr. Walters was properly held responsible for more than $3,100 in losses. But the attribution to Mr. Walters of losses from the entire scheme was not only inconsistent with the relevant conduct provision, as interpreted by this Court in Lloyd and the Second Circuit in Studley, but the result was also profoundly unfair. As the evidence at trial showed, Mr. Walters was a limited and largely ineffectual participant in the scheme masterminded by Donye Mitchell. There is no evidence that Mr. Walters assisted Mitchell with the overall scheme. Mr. Walters — The trial evidence did not — I think some of the documentary evidence may have shown when it got underway in the beginning of 2008, but Mr. Walters' involvement was only in the beginning — the record showed that only in the beginning of January 2009. It's about a year later. A year later, correct. Okay. So, counsel, even if we discount all of the activities in that year, wouldn't the loss amount range still place your client within the guidelines range under which he was sentenced? I don't see this primarily as a temporal problem. I think that the problem — Well, but could you answer that question first? If we assume that it is a temporal consideration and we discount all of the activities that were in the year before you assert your client became part of the scheme, would it change the result of his sentence under the guidelines? Right. You know, it would be a fairly complicated calculation, which I don't have in front of me, because you'd have to discern which claimants in the spreadsheet that has hundreds of claimants, which claimants were — you know, began before he started in 2009. But not only that, but then some of them also continued. You know, so they started in 2008 and continued in 2009. So I don't think it would have a major impact, but in terms of, you know, I'd be happy to submit something. No, I thought the record reflected that there was roughly like a little over $100,000 that was attributable to the scheme in that year of the companies with which your client was affiliated before he became part of the scheme. And even if we took away that roughly $100,000, it would not change the loss amount or the calculation of the guidelines range. And, again, I have to double-check that, but I think that may be right. I think most of the activity with regard to the companies that we're talking about here occurred, you know, 2009 and afterwards. Well, why wouldn't that be — if my recollection is correct, why wouldn't that render any error harmless? Well, because I think it's — again, I don't think it is a temporal consideration. I mean, I think the issue under Lloyd and Studley is, you know, whether the defendant planned or designed the scheme, whether the defendant coordinated with, you know, other managers in the scheme. Those are the kinds of things that you look at under Lloyd and Studley. And I don't see that here. On this record, there's just no evidence of that kind of activity. I mean, he was responsible for the claimants, you know, about 25 to 30 claimants or so. You know, those are the claimants that he was listed as the so-called manager for. But there's no evidence — you know, there's certainly no evidence presented at trial that showed that he had a broader involvement in the scheme, that he designed the scheme, that he was responsible for the overall scheme in some way. Didn't he recruit other recruiters? He — it's — he had two people come on that were — that brought on a very few number of claimants. I mean, one of them was his roommate. And if you kind of figure out how much they brought in, I mean, we're talking, you know, maybe $30,000, maybe a little bit more than that. It's not — you know, again, it's nowhere near the $5.2 million. I mean, he basically — his roommate needed some help financially. He's like, hey, do you — you know, can you help me out in this? You know, it was that kind of informal arrangement. It wasn't — you know, he was out there recruiting recruiters, you know, the way that the judge stated. And again, you know, these had very little impact on the losses, if you look at that factor. Well, if he's only managing this handful of his direct claimants, I guess you would call them, How do you explain 2,100 phone calls to the EDD and over 1,700 calls to the other participants? Sounds like — I mean, he was doing something with regard to his other people and other claims. The 2,100 phone calls — actually, a majority of those phone calls occurred during a two-day period, only a two-day period. So — and they were, you know, basically call up, hang up because the line is busy. So it's compulsive calling in a two-day period. It's not 2,100 phone calls over a few years. And so — and with regard to the other calls, I think what's significant, actually, is that the government didn't introduce any evidence that he was calling other managers in the scheme. Again, this goes to the coordination with the other managers. They didn't introduce any of that kind of evidence at all. I mean, so the fact that he was calling the claimants — again, we're not arguing that he's responsible for his own claimants. You know, that's where the calls were. They were to the claimants. They were to the EDD. But they're not with regard to the broader scheme. This is not somebody who's facilitating the broader scheme. And, again, I think if you look at Studley and Lloyd, you know, those are the kinds of factors that we need to be looking at. What about Treadwell? Yeah. Well — It was before Lloyd. Right. Well, I think — again, I think it's the same factors are — you know, you look at the same kind of factors. And to me, the cases are very clear about this. I mean, they run down the line. You know, did he share in the profits of the overall scheme? No, he didn't share in the profits of the overall scheme. He just got a bit of money from his own claim and from the claimants. And — How long did he participate? What did the evidence show at trial the time that he was involved in the scheme? So what — What did the evidence show at trial regarding the amount of time that he was in the scheme, that he participated in the scheme? I believe it was a couple of years at most. We're talking early 2009 to — And to what extent do we consider or should the district judge consider foreseeability, whether it was foreseeable that these other characters would engage in this kind of activity? Well, here — And why shouldn't he be held responsible for that? He's a joint participant in this scheme. Well, if you look at the debriefings of Mr. Mitchell that the government itself introduced during the sentencing, you know, it shows that it wasn't at all foreseeable, that Mr. Mitchell — that these other managers were bringing in hundreds of people circumventing Mr. Mitchell. You know, even — There's one page of claimants where we have 60 claimants, over $1.5 million. We don't even know from the record — I mean, those are claimants that don't show up anywhere in the documents seized from Mr. Mitchell's residence or his car. So there's nothing in the record that even showed that these claimants were involved with Mr. Mitchell, much less Mr. Walters. Well, foreseeability, there was a — There was testimony about a spreadsheet that was available and utilized by all the participants, all the managers, including your client, which set forth all the claims. It seems to me that's a pretty good indication of the scope of this particular fraud. But the claimants — I mean, that's my point, though, that that spreadsheet, if you compare that spreadsheet that was seized from Mr. Mitchell's residence with the law spreadsheet that the government introduced, you know, at sentencing, they don't correspond. There's a lot of other — The point is not whether they're the same claimants. The point is whether it deals with foreseeability. If you're looking — if you're working from a spreadsheet that represents hundreds of claimants, it should be pretty foreseeable that these claimants are defrauding the EDD. And he should be — it seems to me it's common sense that he's now aware of the breadth of the scheme. Well, I think the government could have brought that kind of evidence into trial. They could have called Mr. Mitchell. But there was no — as far as I know, there was no evidence at trial that Mr. Walters worked with these spreadsheets. So that's not evidence that the government introduced at trial or at sentencing. So I don't think that does go to the foreseeability analysis. And, you know, if you look at these cases, again, they say, and the guidelines themselves as well, that mere knowledge is not enough. You know, that's not what — it has to be jointly undertaken criminal activity. Again, with regard to his claimants, I don't dispute that that's the case. But with regard to all of these other claimants that were used to get to the $5.2 million number, I do. Mitchell did not testify at trial? He did not testify at trial, correct. That relates to your complaint about the failure to grant a continuance. Is that right? Yes. Is that a question? No. Okay. It's an observation. Okay. I see I only have five minutes left. Yes. Do you want to save that for rebuttal? Yes, please. Okay. Thank you. Good morning, and may it please the Court. Matthew Yelovich for the United States. I wanted to start with some of the questions about Mr. Walters' involvement in terms of time that the Court had in the opening argument. There is, in fact, evidence in the record. There was evidence produced at trial, introduced at trial, that there were stated wages for Mr. Walters and for those he recruited throughout 2008 with EDD for those fake companies. So his involvement suddenly starting in January 2009 doesn't explain those records that were introduced at trial and that are not really disputed here on appeal. I would refer the Court to excerpts of record, page 343, and supplemental excerpts of record. So does that mean that it's your – it's the government's position that he was involved from the get-go? It's not clear from the record as to exactly when Mr. Mitchell started the fictitious businesses, although Mr. Mitchell's account is that he started those businesses with an eye towards some kind of legitimate use for them at the start. At a minimum, it's clear from the records, and it is the government's position, that this defendant was involved for the entirety of the false claims on that law spreadsheet that was used at sentencing. And to Judge Rawlinson's point, even if – And what was the first entry, the date of that first entry? They're annual reports that are filed quarterly, Your Honor. And so Mr. Walters had quarterly wages throughout 2008, as did Nehemiah Mendoza,  And so those records, in addition to other people that Mr. Walters recruited, the stated wages for Darnell Rashard are at supplemental excerpts of record, page 123. That's in 2008 as well. Kyle Candelo is supplemental excerpts of record, page 125. Those are fictitious wages reported in 2008, and those are people who came in at trial and testified that Mr. Walters had recruited them to this scheme. And so did you attempt in providing information to the jury to limit it to the period of time when the defendant was actively involved in this scheme? Because I had a different view of that, that it was the whole scheme and it did not have a temporal beginning and end. The evidence at trial established the existence of the scheme and the defendant's knowing participation in it. The focus of the government's case was not a temporal aspect, but that did become relevant at sentencing. But that's not quite my question. I thought you said that it only included those claims, those false claims, during the period of time he was actively participating in the joint enterprise. But that was for sentencing, during sentencing, not during the trial. That's correct. That evidence was presented. That's correct, Your Honor. The certified business records of EDD were introduced at trial to show his participation. They also happened to show the temporal aspect that became relevant at sentencing because they have fictitious wages reported for throughout the year 2008. So let me ask you this. I'm still, I guess I'm a little bit confused. So at sentencing, did the government take the position that the $5 million plus was the total loss from Mitchell's scheme? No, Your Honor. The total loss from Mr. Mitchell's scheme involved five fictitious businesses and over 550. Let me jump. With regard to the two companies we're involved with, that's what we're asking, just those two companies, PICO and the other one. What was the other one? Financial Builders. Just those two. Right. I should have been clear. I should have clarified that. Is that the $5 million? The $5.2 million on the spreadsheet was all losses from those two fictitious businesses that EDD had calculated from the end of 2008 through the end of 2010, which was the time that this defendant was a participant in the scheme. Then I don't know. It seems to me that at sentencing there was some discussion that Mr. Walters was not involved for the first year. What was that in reference to? Well, that was in reference to the year 2008. His attorney attempted to assert that he was not involved in 2008 and that Mr. Mitchell was going to come forward and either provide a letter or testify at sentencing as to Mr. Walters becoming involved later in the scheme. I believe citing the fact that Mr. Walters applied for unemployment benefits under his own name in January 2009. But, again, the records are clear that the fictitious wages both for this defendant and for those he recruited were submitted throughout 2008. So it's just not plausible that the defendant didn't become involved until 2009. Now, I'm sorry, Your Honor. Go ahead. I was going to ask you what your position was on my question regarding the amount that if we accepted the defendant's version of events as to when he was a participant, what difference would that make in the loss amount and the sentencing? The government agrees with the harmless error analysis point, which is that the government's argument is even if you excluded all losses from that spreadsheet for 2008, the number would be roughly $120,000, and that would not push the defendant below the next threshold in the 2B1.1 table, and so therefore would be harmless in terms of the guidelines range calculation. However, for the reasons that I articulated, it's quite fair for the sentencing court here to have held Mr. Walters accountable for losses that occurred in 2008 as well, since fictitious wages were stated for him and those he recruited in 2008. If there are not other questions on the loss calculation, I'd just briefly like to touch on the continuance issue. This Court analyzes denial of a motion to continue under a four-factor test in United States v. Flint. The defendant fails at all four prongs, and the district court did not clearly abuse its discretion in denying that continuance request. And as to the sentence itself, the below-guideline sentence was not substantively unreasonable, because it resulted from a meaningful consideration of the Section 3553a factors by the sentencing judge, who was uniquely well-positioned to determine what the defendant did, the scope of his jointly undertaking criminal activity, having sat through trial and sentenced the other managers in the scheme. Sotomayor, were you trial counsel for this case? I was, Your Honor. Did the pre-sentence report make any attempt to define when Walters was involved? The pre-sentence report focused on when the fictitious business started it. I believe the answer to your question is no, Your Honor. The pre-sentence report did delineate Mr. Walters' involvement and describe the people he recruited and the loss attributable to his time in the scheme, but didn't focus on his start and end dates in the scheme. Okay. Are there no further questions? I don't think so. The government submits. Thank you.  Thank you. Thank you. I think this will be fairly short. With regard to Treadwell. Do you agree with the government's position that the loss calculation dealt with only those two corporations or companies and only during the period of time when your client had submitted a claim for himself or his recruits? Yes, and that's probably why I'm a little confused about the 2008 discussion, because I look at the government's spreadsheet, and I don't see any claims, any applications that began in 2008. And so they're all 2009, 2010. So the issue goes away then. What's that? Then the issue goes away. Right. I personally don't understand it, and I don't think that there's anything in the record that shows that Walters was involved in 2008, but regardless. There was some discussion at sentencing. There was some discussion. Where the argument was made that he's being held accountable for losses that were sustained before he even joined in. Right. But as far as I read the spreadsheet, I didn't see any entries for claims that were filed in 2008. Maybe I'm mistaken, but I don't see anything in the record about that. You were not trial counsel. No, I was not trial counsel. That maybe explains it. Right. I did read the record carefully, though. Now, with regard to Treadwell, I just want to make the point that if you look at Treadwell at page 1005, it says there's ample evidence in the record to support the district court's findings. Both defendants described themselves as founders of the investment companies. Both led conference calls with the company's nationwide sales force. Both traveled around the country selling their company's investment strategy. Both misrepresented the investment companies. And they both profited from their mutual efforts. So, again, I mean, I think just like the other cases, this just highlights what we don't have here. You know, we don't have a defendant who's profiting from the overall operation. We don't have a defendant who's helping coordinate the overall operation, who's planning, who's designing it. And so I think if the court — in fact, we have really the opposite. We have a scheme that's out of control. I mean, the scheme — nobody really knows who some of these claimants are. And he's being held responsible for all of them. So I think if this court were to go, you know, against the appellant in this case, you would really be changing the law in this area. You'd be going against, you know, a pretty clear line of cases about what the factors are considered to hold a defendant responsible for loss. Counsel, what is our standard of review on this issue? Our position is that it's de novo review because there's no dispute really about the facts. This is really the legal significance of the facts. But, you know, I recognize that under Garcia-Ruiz, you know, the court has held that it's an abuse of discretion standard. But the court did leave open the door to say that there's potential de novo review. I believe that this kind of case, where there's really no dispute about the facts, it's just about the legal significance of the facts. Well, there is a dispute about the amount of loss that should be attributed to your client. Well, I see that more as the legal significance of the facts in the record. I don't see that as a dispute about the facts. But the court had to come to a determination regarding the amount of loss to set the guideline range. Right. But I think the court basically is misapplying the law. I don't think that this is a case where the court — I mean, there was the error about the recruitment parties, the clear error about the recruitment parties. But, you know, leaving that aside, I think there's really generally no dispute. I mean, all the evidence I relied upon in my brief, I mean, it was all evidence that the government itself introduced at trial and at sentencing. So I don't think that there is — I think where there is no dispute, I think it should be dealt with. So what is the — based on your complete review of the record, and you may have noted this in the brief, but I don't remember now, what is the amount of loss that you contend, I mean, that the district court should have relied upon in fixing the guideline range? The actual loss is around the number of $180,000. But I think the — And you get that only from looking at his clients? Correct. The claimants that he was involved with, and his own claim. And his own claim. Right. But I think it would be proper, if the court were to reverse, I think it would be proper to remand to recalculate, you know, what the loss is. And so, you know, I don't bind myself to that number, but I believe that's about that number. Right. I understand. But how could we recalculate? You would want the district court to recalculate the loss? I think that would be appropriate. Isn't that a factual finding? What's that? Isn't that a factual finding? Well, no. I think it is. Well, I think, again, it's just — I think you'd have to tell the court — you would have to instruct the court what law — you know, what is the correct law to apply. You know, and the court below did not cite Lloyd. And — He did not cite those cases, but he recited what he thought the law was. And my recollection was, it was pretty accurate what the law was in the standard. He just came to a different conclusion with regard to the impact of the things that he saw through many days sitting there watching a jury trial to come to a conclusion that these things were more than just dealing with his own recruits. The district judge did correctly recite the language of the guidelines, but I think you have to go beyond that language and look at the factors that the cases look at under these circumstances. Every case is going to be different, isn't it? I'm sorry? Every case is going to be different. But I think — Dredwell is different in one way than the facts in Lloyd. They went a different way. But I think the fact — they're not just — it's not just the facts are different. They're applying factors. Was the defendant involved in the planning? Was the defendant involved — did the defendant share profits? Did the defendant coordinate with other managers? You know, those are the — those are not just facts. Those are the legal issues that the courts look at. Those are non-exclusive factors that can be considered. But each case brings its own factors. In this case, I thought the judge did a fairly substantial case — job of setting forth the various factors and why he felt that led to his determination of the loss. Well, obviously, I respectfully disagree. Okay. I have one final question. In your brief on page 40, you talked about clear error, the clear error standard of review. Why did you put that in your brief if you think de novo review is the appropriate standard? Because it — just covering both. You know, so in the case the Court determines that it's clear error review, you know, I want to make a record as to why I believe it's clear error as well. That's why. All right. Thank you, counsel. Thank you, Your Honor. Thank you, counsel. The matter is submitted at this time.
judges: Paez, Rawlinson, Huck